Filed 7/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MILAGROS AZUCENA WENDZ,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF<br>EDUCATION et al.,<br><br>     Defendants and Respondents. | A162648<br><br>(San Francisco County<br>Super. Ct. No. CPF20517067) |

The Legislature charged respondent Superintendent of Public Instruction (Superintendent) with "ensur[ing] effective parental involvement" in the Migrant Education Program (MEP), the purpose of which is to address the unique educational needs of migrant children.  (Ed. Code, §§ 54440, 54444.2, subd. (a).)[1]  As part of this mandate, the Superintendent must establish regional parent advisory councils (RPACs) to consult with local educational agencies in the planning, operation, and evaluation of migrant education programs.  (§ 54444.2, subd. (a)(1).)  In 2019, the Superintendent adopted regulations concerning the formation and governance of RPACs, including regulations that could affect the size and makeup of the councils.[2]

---

[1] All undesignated statutory references are to the Education Code.

[2] In 2020, after the Superintendent adopted the challenged regulations, the Legislature amended section 54444.2.  (Stats. 2020, ch. 24, § 60.)  As relevant to this appeal, the amendments made non-substantive changes to

Appellant Milagros Azucena Wendz sought to invalidate the regulations in a petition for a writ of mandate, and she appeals from the trial court's denial in part of her petition. Wendz argues the trial court should have granted her petition in its entirety because the Superintendent's adoption of the regulations was outside his statutory authority, as section 54444.2 provides migrant parents the "sole authority" to "decide on the composition of the council." (§ 54444.2, subd. (a)(1)(A).) She also argues that the regulations conflict with the statute because they place impermissible restrictions on migrant parents' authority to nominate and elect RPAC members from the community. She further argues that the necessity of the regulations to effectuate the purpose of the MEP was not supported by substantial evidence. Finally, she argues that respondents failed to comply with several procedural requirements of the Administrative Procedure Act (APA, Gov. Code, § 11340 et seq.).[3]

We conclude the Superintendent acted within his authority in adopting the challenged regulations. We agree, however, that the Superintendent violated the APA's notice requirements when he adopted a regulation prohibiting RPAC members' use of alternates without adequate notice to the public. He otherwise complied with the APA in adopting the regulations, and

---

subdivision (a) of section 54444.2, and therefore we consider the current version of that subdivision.

[3] The Superintendent is the director of respondent California Department of Education (CDE). (§§ 33301, 33303.) Throughout her opening brief, Wendz uses "SPI," "Superintendent," and "respondents" interchangeably when arguing that the regulations are invalid. The record shows that the Superintendent adopted the regulations pursuant to his authority under section 54444.2, while CDE staff assisted him in the rulemaking proceeding. Thus, for the sake of consistency, we refer to the Superintendent as the party who proposed and adopted the regulations.

the necessity of the regulations is supported by substantial evidence.  We therefore conclude the regulations are valid except for the prohibition on alternates and the portions of the regulations the trial court invalidated, and the petition for a writ of mandate is granted only to the extent it seeks to compel respondents to refrain from enforcing those portions of the regulations.

## I.  BACKGROUND

### A. *The Migrant Education Act*

In 1976, the Legislature created the MEP by enacting the Migrant Education Act (the Act) in recognition that the unique problems facing migrant children in the state educational system "are of such magnitude and severity that local school districts have been unable to solve them with the resources normally available.  It is, therefore, necessary for the state to aid local school districts through regional coordinating offices and the provision of special programs of educational and related services for these children." (§ 54440, subd. (b).)

Under the Act, the State Board of Education must adopt a master plan for services to migrant children, which is to include instructional activities designed to identify and address migrant children's academic deficiencies, health and welfare services, and supportive services for migrant families. (§ 54442, subds. (a), (b), (d).)  The plan requires "[t]he active involvement of parents, teachers, and community representatives in the local implementation of migrant education."  (§ 54442, subd. (f).)  The Act charges the Superintendent with implementing the plan adopted by the State Board of Education (§ 54444), and authorizes the State Board of Education to adopt rules and regulations "necessary to implement the provisions of this article" (§ 54445).

3

### B. Regional Migrant Parent Advisory Councils

In 1981, the Legislature amended the Act, adding several sections. The purpose of the amendments was to provide state standards for migrant education "in the absence of regulations by the State Board of Education . . . ."

As relevant to this appeal, one of the sections added by the amendments is section 54444.2, which provides that "[t]he Superintendent shall take the steps necessary to ensure effective parental involvement throughout the state migrant education program . . . ." (§ 54444.2, subd. (a).) Those steps "shall include, but need not be limited to," the adoption of "rules and regulations requiring each operating agency receiving migrant education funds or services to actively solicit parental involvement in the planning, operation, and evaluation of its programs through the establishment of, and consultation with, a parent advisory council." (§ 54444.2, subd. (a)(1).) An "operating agency" means "a local educational agency operating under a subgrant of state migrant education funding, or a public or private nonprofit agency . . . ." (§ 54441, subd. (e).) These parent advisory councils are what the parties have termed regional parent advisory councils (or RPACs). Subdivision (a)(2) requires the Superintendent to separately establish a statewide parent advisory council (or SPAC). (§ 54444.2, subd. (a)(2).)

Subdivision (a)(1)(A) of section 54444.2 provides standards for the formation of regional parent advisory councils: "The membership of each parent advisory council shall be composed of members who are knowledgeable of the needs of migrant children, and shall be elected by the parents of migrant children enrolled in the operating agency's programs. The composition of the council shall be determined by the parents at a general meeting to which all parents of pupils enrolled in the migrant program shall

4

be invited. Parents shall be informed, in a language they understand, that the parents have the sole authority to decide on the composition of the council. All parent candidates for the council shall be nominated by parents; nonparent candidates shall be nominated by the groups they represent: teachers by teachers, administrators by administrators, other school personnel by other school personnel, and pupils by pupils. All other community candidates shall be nominated by the parents." (§ 54444.2, subd. (a)(1)(A).) That section further provides that "[a]t least two-thirds of the members of each parent advisory council shall be the parents of migrant children." (§ 54444.2, subd. (a)(1)(B).)

## C. The Regulations Promulgated by the Superintendent

In 2018, the Superintendent began drafting regulations "to promote the orderly and efficient operation of the [regional parent advisory councils] throughout the State." Over a period of almost 1 year, the Superintendent and CDE staff drafted proposed regulations, received public comments, and held a hearing on the proposed regulations. In November 2019, the Superintendent adopted regulations. Wendz challenges several of those regulations on the ground that they undermine migrant parents' authority under subdivision (a)(1)(A) of section 54444.2 to determine the "composition" of regional parent advisory councils and to nominate and elect community members.

### 1. Nominations of Community Members

California Code of Regulations, title 5, section 12013 delineates the nomination process for community RPAC members. (Cal. Code Regs., tit. 5, § 12013, subd. (a).) The specific parts of the regulation that Wendz challenges are the provisions stating that individual council members "may" nominate eligible community members (Cal. Code Regs., tit. 5, § 12013, subd.

5

(a)) and that a candidate's name shall be withdrawn from nomination if the migrant region determines that a candidate is ineligible (Cal. Code Regs., tit. 5, § 12013, subd. (a)(7)).

### 2. *Member Term Limits*

The challenged portions of California Code of Regulations, title 5, section 12014, subdivision (a), provide that "[a] term of office for eligible parent members shall not exceed two years[,]" and an eligible parent member cannot be elected for more than two terms. (Cal. Code Regs., tit. 5, § 12014, subd. (a).) Similarly, a term of office for community members cannot exceed one year, and community members are limited to two terms. (Cal. Code Regs., tit. 5, § 12014, subd. (b).)

### 3. *Size and Makeup of Regional Councils*

California Code of Regulations, title 5, section 12011, provides that, "The RPAC shall be comprised of up to 15 eligible parent members with no alternate members." (Cal. Code Regs., tit. 5, § 12011, subd. (a).) That section further provides that regional councils "may include up to three optional community members . . . ." (Cal. Code Regs., tit. 5, § 12011, subds. (b), (c).)

### 4. *Community Member Candidate Qualifications*

California Code of Regulations, title 5, section 12010 defines "eligible community member" as a person who "is knowledgeable about the needs of migrant children, and is either an eligible migrant child or a professional working in the field of education and social and health services . . . ." (Cal. Code Regs., tit. 5, § 12010, subd. (b)(1).) It further provides that "eligible community member" excludes parent members and employees "of a Migrant Education Program at the district, county, or state level," or employees of the CDE. (Cal. Code Regs., tit. 5, § 12010, subd. (b)(2), (3).)

6

### 5. *Disqualifying Regional Council Members*

Finally, Wendz challenges the provisions in California Code of Regulations, title 5, section 12015, that allows for the disqualification of RPAC members under certain circumstances. That regulation authorizes the County Superintendent to terminate a member from the regional council on specified grounds, including "good cause[,]" which includes "but is not limited to, severe or repetitive conduct that is abusive to other persons or disruptive to the meetings or other official business of the RPAC." (Cal. Code Regs., tit. 5, § 12015, subd. (a)(2).) The County Superintendent may also terminate members that do not attend two meetings in a "given term" or for "[e]ngaging in inappropriate conduct that discredits the RPAC or the County Superintendent." (Cal. Code Regs., tit. 5, § 12015, subd. (a)(1), (3).)

### D. The Mandate Proceedings

In March 2020, Wendz filed a petition for a writ of mandate and complaint for declaratory and injunctive relief against respondents, alleging that the above regulations were beyond the scope of authority conferred on the Superintendent by the Legislature and "place[d] invalid restrictions on the criteria for membership, [and on] the composition of and the manner by which the Regional Parent Advisory Council members are nominated or elected," in conflict with the mandate in section 54444.2, subdivision (a)(1)(A) that "the parents have the sole authority to decide on the composition of the council . . . ." The petition additionally alleged that respondents' determination that the regulations were "reasonably necessary" to effectuate the purpose of the Act was not supported by substantial evidence. The petition further alleged that California Code of Regulations, title 5, section 12011, subdivision (a) violated the APA because the Superintendent added the prohibition on members' use of alternates after the initial comment

7

period had ended without providing an additional 45-days' notice, despite the prohibition constituting a substantive change to the regulation. Finally, the petition alleged that respondents failed to comply with the APA because they did not describe reasonable alternatives to the regulations in their initial statement of reasons.

In November 2020, Wendz moved for entry of writ of mandate, asserting the same arguments as in her petition for writ of mandate. Wendz further argued that respondents violated the APA by failing to provide supporting information in their final statement of reasons regarding the lack of reasonable alternatives.

In opposition, respondents argued that the regulations fell within the scope of authority granted by the Legislature to the Superintendent, because section 54444.2, subdivision (a), charges the Superintendent with taking "the steps necessary to ensure effective parental involvement[,]" and the regulations seek to increase parent participation. Respondents further argued that none of the regulations were inconsistent with the Act, as they preserved migrant parents' authority to determine the composition of regional councils. Respondents also argued that the administrative record and judicially-noticeable evidence supported respondents' promulgation of the regulations as reasonably necessary to ensure effective parental involvement.

In February 2021, after hearing argument and taking the matter under submission, the court granted in part and denied in part the petition for writ of mandate. The court concluded that the Superintendent had the authority to adopt rules and regulations regarding RPACs under section 54444.2, and that the statute provided parents the authority to elect members and "no more." The court invalidated subdivision (c) of California Code of

8

Regulations, title 5, section 12014 and the phrase "[t]o the extent possible" in subdivision (d) of California Code of Regulations, title 5, section 12019 as inconsistent with the Act but concluded that the rest of the challenged regulations were consistent with the Act.[4]  Finally, the court concluded that respondents did not violate the APA in adopting the regulations.  The court therefore rescinded subdivision (c) of California Code of Regulations, title 5, section 12014 and the phrase "[t]o the extent possible" in subdivision (d) of California Code of Regulations, title 5, section 12019, and in all other respects, it denied Wendz's application for a writ of mandate and entered judgment on her complaint in favor of respondents.

This appeal followed.

## II.    DISCUSSION

### A. The Superintendent Has the Authority to Adopt the Regulations.

"Administrative agencies have only the powers conferred on them, either expressly or impliedly, by the Constitution or by statute, and administrative actions exceeding those powers are void." (*Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 872.)  "If the court determines that a challenged administrative action was not authorized by or is inconsistent with acts of the Legislature, that action is void." (*Id.* at p. 873.)  Here, Wendz argues that the Superintendent lacked authority to adopt the challenged regulations, and that the regulations conflict with the Act because section 54444.2, subdivision (a)(1)(A), gave migrant parents the "sole authority" to determine the "composition" of the councils.  She additionally argues that the

---

[4] Neither party challenges on appeal the trial court's invalidation of subdivision (c) of California Code of Regulations, title 5, section 12014 and the phrase "[t]o the extent possible" in subdivision (d) of California Code of Regulations, title 5, section 12019.  We therefore presume the trial court was correct in invalidating those portions of the regulations.

regulations conflict with certain provisions of section 54444.2, subdivision (a)(1)(A), that deal specifically with community members.  We address these arguments in turn.

### 1. *Standard of Review*

Where, as here, a party challenges a regulation on the ground that it conflicts with the governing statute or exceeds the lawmaking authority delegated by the Legislature, "the issue of statutory construction is a question of law on which a court exercises independent judgment."  (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415–416.)  "A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature."  (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4.)  "The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued."  (*Ibid.*)

### 2. *The Regulations Are a Valid Exercise of the Superintendent's Authority to "Fill Up the Details" of Section 54444.2.*

The creation of an agency's regulatory power is a delegation of legislative authority.  "Essentials of the legislative function include the determination and formulation of legislative policy."  (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 746–747.)  " 'The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' "  (*Id.* at p. 747.)  Where an agency exercises discretion explicitly conferred on it, it is presumed to act within

10

legislative intent.  (*California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, 620.)

To determine whether the Superintendent had the authority to adopt the challenged regulations, we begin with the Legislature's express grant of authority to him in section 54444.2:  "The Superintendent shall take the steps necessary to ensure effective parental involvement throughout the state migrant education program . . . ."  (§ 54444.2, subd. (a).)  The broad grant of authority to the Superintendent to "take the steps necessary" and the generality of the legislative goal to "ensure effective parental involvement" in the MEP show that the Legislature has deferred to the Superintendent's expertise and granted him considerable discretion to determine what steps are necessary to accomplish that goal.  (See *California Chamber of Commerce v. State Air Resources Bd.*, *supra*, 10 Cal.App.5th at p. 622 [holding that because the statutory scheme only "broadly set forth its goals[,] . . . [the] Legislature obviously intended the program to be a creature of the Board"]; *Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 656 [holding that statutes provided the commissioner with "broad discretion" to determine what reasonable rules and regulations in the area of credit insurance are necessary to promote the public welfare].)

Despite the Superintendent's broad discretionary power under section 54444.2, Wendz points out that the statute does not expressly grant him the authority to adopt regulations pertaining to RPAC member qualifications and the size of the councils and their overall structure; the only explicit grant of regulatory authority is that found in subdivision (a)(1), which directs the Superintendent to "adopt rules and regulations requiring each operating agency . . . to actively solicit parental involvement . . . through the establishment of, and consultation with, a parent advisory council [or

11

RPAC].” (§ 54444.2, subd. (a)(1)).  Wendz appears to suggest that because this is the sole grant of regulatory authority in the statute, the Superintendent only has the regulatory power to ensure that local agencies establish and consult with RPACs and not the authority to adopt regulations concerning “the makeup of those councils, including how large they are or who can serve on them.”  But “ ‘[a]n administrative agency is not limited to the exact provisions of a statute in adopting regulations to enforce its mandate.  “[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority. ...” [Citations.] [The administrative agency] is authorized to “ ‘fill up the details’ ” of the statutory scheme. [Citation.]’ [Citations.]” (*Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 171.)  Moreover, “ ‘where power is given to perform an act, the authority to employ all necessary means to accomplish the end is always one of the implications of the law.’ ” (*Manteca Union High School Dist. v. City of Stockton* (1961) 197 Cal.App.2d 750, 755.)  Here, in addition to section 54444.2’s broad grant of authority to the Superintendent, the statute’s language and its context support a conclusion that the Superintendent’s power to regulate the RPACs is not limited to ensuring local agencies establish and consult with RPACs, and instead extends to the formation and structure of the councils.

Subdivision (a)(1) of section 54444.2 is part of a *non-exhaustive* list of steps the Superintendent is required to take to fulfill his mandate: “the steps necessary to ensure effective parental involvement throughout the state migrant education program . . . shall *include, but need not be limited to*, all of the following” steps set forth in five enumerated subparts, including subdivision (a)(1). (§ 54444.2, subd. (a), italics added; see *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389, superseded

12

by statute on another issue [the phrase "shall include, but need not be limited to" is a "phrase of enlargement"].) Based on the plain language in subdivision (a), the Legislature intended for the subparts under subdivision (a) to represent steps the Superintendent is required to take to ensure effective parental involvement, but not to limit the Superintendent's discretion to take other steps he deems necessary to ensure effective parental involvement, including adopting other rules and regulations. Nothing in the legislative history of the Act indicates otherwise. Had the Legislature intended to establish an exhaustive list of the steps the Superintendent is permitted to take to ensure effective parental involvement in the MEP or to limit the Superintendent's regulatory power, it could have easily done so.

Section 54444.2 does not otherwise limit the Superintendent's discretion to supplement its directives, including those pertaining to RPACs. Subdivision (a)(1) is divided into subdivision (a)(1)(A) and (B), which sets forth certain directives concerning the formation and structure of RPACs, including some limits on who can nominate candidates and elect members. (§ 54444.2, subd. (a)(1)(A), (B).) But section 54444.2 ultimately provides few details on those matters, and there is no indication in the statute that the Legislature determined those statutory directives were sufficient on their own to ensure effective parental involvement in the RPACs.

In sum, this case involves a statutory scheme that sets forth a general goal and broadly empowers the Superintendent to take whatever steps are necessary to achieve that goal, and within the same subdivision, identifies RPACs as one way to accomplish that goal and certain requirements for RPACs. (§ 54444.2, subd. (a).) Given this hierarchal organization and the statutory language previously discussed, it is clear to us that the Superintendent's power to "fill up the details" of the statute through adoption

13

of regulations that supplement the statutory directives pertaining to RPACs is an " 'additional power[] . . . necessary for the due and efficient administration of powers expressly granted' " by section 54444.2 or " '*fairly . . . implied* from the [provision] granting the powers.' " (*Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 617.)

The Superintendent has properly exercised this power by adopting the challenged regulations, as they clarify the nomination and election process for RPACs and specify additional criteria for their formation and structure, matters that could impact the effectiveness of parental involvement in the RPACs. The lack of specific statutory provisions on many of the issues addressed by the Superintendent's regulations—including member term limits and member disqualification—does not mean that regulations as to such issues exceed his statutory authority, but only that the Legislature did not itself choose to determine the issues and instead deferred to and relied upon the expertise of the Superintendent. (See *Credit Ins. Gen. Agents Assn. v. Payne, supra,* 16 Cal.3d at p. 656 ["Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies"].)

Wendz appears to acknowledge the Superintendent's broad implied powers under section 54444.2. Her primary argument on appeal is that the Superintendent's implicit authority does not "trump" the express authority the Legislature granted migrant parents under the statute. However, as we find below, the regulations are consistent with the statute.

### 3. *The Regulations Are Consistent with Parents' Authority to Determine the "Composition" of the RPACs*

Subdivision (a)(1)(A) of section 54444.2 provides in full: "The membership of each parent advisory council shall be composed of members

14

who are knowledgeable of the needs of migrant children, and shall be elected by the parents of migrant children enrolled in the operating agency's programs. *The composition of the council shall be determined by the parents* at a general meeting to which all parents of pupils enrolled in the migrant program shall be invited. Parents shall be informed, in a language they understand, *that the parents have the sole authority to decide on the composition of the council.* All parent candidates for the council shall be nominated by parents; nonparent candidates shall be nominated by the groups they represent: teachers by teachers, administrators by administrators, other school personnel by other school personnel, and pupils by pupils. All other community candidates shall be nominated by the parents. Each parent advisory council shall hold meetings on a regular basis during the operation of the regular program, but not less than six times during the year." (§ 54444.2, subd. (a)(1)(A), italics added.)

Wendz contends that the emphasized language in that paragraph shows that the Legislature vested exclusive authority in migrant parents to determine the composition of RPACs. She argues that the terms "determine[]" and "decide on the composition" refer to "the setting of qualifications for serving on the council, the size of the council, the breakdown of the council, etc." Thus, according to Wendz, the regulations adopted by the Superintendent that place a limit on the number of parent and community RPAC members, that impose member term limits, that provide a definition of "eligible community member," and that specify grounds for member disqualification conflict with section 54444.2 because they restrict parents' exclusive authority to determine the composition of the councils. In response, respondents define the terms narrowly, arguing that as used in section 54444.2, they refer only to parents' authority to elect RPAC

members.

"A regulation cannot restrict or enlarge the scope of a statute." (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1600, modified by statute on other grounds as stated in *Denver D. Darling, Inc. v. Controlled Environment Const., Inc.* (2001) 89 Cal.App.4th 1221, 1231, fn. 4.)  It is therefore incumbent on us to begin by interpreting the phrase "decide on the composition" as it is used in section 54444.2, subdivision (a)(1)(A).  (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 168 ["In interpreting a statute, we first consider its words, giving them their ordinary meaning and construing them in a manner consistent with their context and the apparent purpose of the legislation"].)  If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs.  (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

### a. Parents' Authority to Determine the "Composition" of RPACs Is Limited to Electing Members

The Act does not define "composition" or "decide on the composition." " 'When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590–591; see *Arnall v. Superior Court* (2010) 190 Cal.App.4th 360, 369 ["we look first to the term's 'plain meaning' for guidance" when the statute does not define the term].)  In discerning a term's ordinary meaning, courts regularly turn to general and legal dictionaries. (See *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 244 ["[w]e use the ordinary dictionary meaning of terms when terms are not defined in the statute"]; *E.W. Bliss Co. v. Superior Court* (1989) 210 Cal.App.3d 1254, 1258, fn. 2 ["[a] dictionary is a proper source to

16

determine the usual and ordinary meaning of a word or phrase in a statute"].)

When viewed in isolation, the word "composition" is reasonably susceptible to both parties' interpretation. Dictionary definitions of "composition" show that it can mean "the general makeup" of something (Webster's 9th New Collegiate Dict. (1989) pp. 270, 719) or "the nature of something's ingredients or constituents; the way in which a whole or mixture is made up." (Encyclopedia.com https://www.encyclopedia.com/literature-and-arts/art-and-architecture/art-general/composition#:~:text=com%C2%B7po%C2%B7si%C2%B7tion,the%20social%20composition%20of%20villages. [as of July 12, 2023].) Thus, determining the composition of the council may mean something more than simply electing members. (See Webster's 9th New Collegiate Dict. (1989) p. 400 [defining "elect" as "to select by vote for an office, position, or membership"].) Under a broad definition of "composition," deciding on the composition of a council can reasonably include determining the size of the council and the characteristics of the members that will form the council. On the other hand, "composition" is capable of a narrower definition. (See The American Heritage Dictionary https://www.ahdictionary.com/word/search.html?q=compositions [as of July 12, 2023].) [defining "composition" as "[t]he combining of distinct parts or elements to form a whole"].) Thus, when "composition" is narrowly defined, determining or deciding on the composition of the council may refer to the act of selecting the individual members that will form the council.

But when viewing that language in the context of the entire subdivision (a)(1)(A), as we must, Wendz's construction fails. (*Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381 ["We do not examine that

17

language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment"].)

The subdivision begins with the sentence, "The membership of each parent advisory council shall be *composed* of members knowledgeable of the needs of migrant children, and shall be *elected* by the parents of migrant children . . . ." (§ 54444.2, subd. (a)(1)(A), italics added.) The plain meaning of the term "composed" as used in the first clause establishes that the RPAC membership will be formed from members who are knowledgeable of the needs of migrant children. (See Webster's 9th New Collegiate Dict. (1989) p. 270 [defining "compose" as "to form by putting together"]; Dictionary.com https://www.dictionary.com/browse/compose [as of July 12, 2023] ["to make or form by combining things, parts, or elements"].) In juxtaposing that clause with the second clause requiring that the "membership" be "elected" by parents, the Legislature appears to have intended the first sentence to provide parents the right to compose the council by *electing* eligible members.

The second sentence states that "[t]he *composition* of the council shall be *determined by* the parents at a *general meeting* to which all parents . . . shall be invited." (§ 54444.2, subd. (a)(1)(A).) Because the preceding sentence establishes that parents are to elect RPAC members, the terms "determine[]" the "composition" as used in the second sentence clearly refer to that authority. Thus, the second sentence merely specifies that parents are to exercise their election power at a general meeting. The Legislature's use of the term "composition" in this sentence and of "composed of" in the first sentence further supports such a construction. " '[U]nless a contrary intent appears,' we presume the Legislature intended that we accord the same meaning to similar phrases." (*Scottsdale Ins. Co. v. State Farm Automobile*

18

*Ins. Co.* (2005) 130 Cal.App.4th 890, 899 [holding that "operated by" and "operation" have the same meaning in Insurance Code section 11580.1, subdivision (d)(1)].)

Similarly, the third sentence, when read in context, provides a directive for the general meeting referenced in the prior sentence: "Parents shall be informed, in a language they understand, that the parents have the sole authority to *decide on* the *composition* of the council." (§ 54444.2, subd. (a)(1)(A), italics added.) In other words, parents are to be informed that they alone have the power to *elect* RPAC members at the general meeting.

The next two sentences in subdivision (a)(1)(A) further support a narrow reading of "composition," as they impose limitations on who can be nominated for election to the RPACs, and thus also concern the election process. (§ 54444.2, subd. (a)(1)(A).)

In sum, the first five sentences of subdivision (a)(1)(A), when read together, all concern the election of RPAC members, and not the overall structure of RPACs. Wendz's broad interpretation of the second and third sentences would require us to ignore the immediately preceding and following sentences, which we cannot do.

Moreover, the Legislature used the phrase "sole authority" without qualification in subdivision (a)(1)(A), while at the same time listing certain criteria for who can serve as a member and the overall makeup of the council (e.g., members "shall be knowledgeable of the needs of migrant children," at least two-thirds of the members of the RPACs "shall be" migrant parents, and nonparent groups shall nominate candidates from their respective groups). (§ 54444.2, subd. (a)(1)(A).) This suggests that the Legislature intended to exclude from migrant parents' "sole" authority the power to set member qualifications and to determine the categories and breakdown of membership.

19

If the Legislature intended to grant migrant parents the exclusive authority to determine those matters beyond the minimum requirements set forth in subdivision (a)(1)(A) of section 54444.2, it could have so specified. (See, e.g., § 69525, subd. (a) [providing that one member of the board shall be an employee and one member shall be a student, and that the "commission shall determine the composition of the *remainder* of the board of directors, including both the size and categories of membership of the board," italics added]; see *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 50–51 [holding that there was no limitation period applicable to administrative reclassification proceedings under the Public Employees' Retirement Law, because other statutes "demonstrate the Legislature knows how to draft time limits applicable to specific types of cases when it wants to"].)

Finally, and perhaps most fundamentally, Wendz's construction conflicts with the purpose of the statute "to ensure *effective* parental involvement" in the MEP. (§ 54444.2, subd. (a), italics added.) " 'A statute "will not be given an interpretation in conflict with its clear purpose, and . . . general words used therein will be given a restricted meaning when reason and justice require it, rather than a literal meaning which would lead to an unjust and absurd consequence." ' " (*People v. Bratis* (1977) 73 Cal.App.3d 751, 757.) To accept her interpretation would mean that no matter how inefficient or exclusionary RPACs might become, the Superintendent would be powerless to take regulatory action to fulfill his statutory mandate to "ensure effective parental involvement through the state migrant education program." (§ 54444.2, subd. (a).) That is not a sound construction of the statute. In contrast, an interpretation that "decid[ing] on" or

"determine[ing]" the "composition" is stated in the alternative to "elect" would preserve the Superintendent's ability to fulfill his mandate.[5]

In reaching that determination, we achieve harmony between the various parts of section 54444.2. Every phrase and word—including "sole authority"—serves a function. And the result of our holding accomplishes the intended purpose of the Legislature that the Superintendent discharge his duty to ensure effective parental involvement in the MEP.

### b. *Legislative History*

Wendz argues that the legislative history of the Act supports her interpretation of the term "composition." She specifically points out that in

---

[5] Wendz argues that this interpretation ignores the distinction the Legislature made between subdivision (a)(1)(A) of section 54444.2—which governs RPACs—and subdivision (a)(2)—which governs the state parent advisory council. The latter subdivision also provides parents the authority to elect members to the state parent advisory council but does not include similar language to that in the second and third sentences in subdivision (a)(1)(A) that parents are to determine the composition of the council at a general meeting and that they are to be informed of their "sole authority" to decide on the composition. (§ 54444.2, subd. (a)(1)(A), (2).) According to Wendz, this omission from subdivision (a)(2) of section 54444.2 shows that the Legislature intended to define "elect" and "decide on the composition" differently. However, subdivision (a)(2) of section 54444.2 grants only parents the authority to elect *and* nominate members for the state parent advisory council, while subdivision (a)(1)(A) authorizes nonparent groups to nominate candidates for the RPACs. (§ 54444.2, subd. (a)(1)(A), & (2).) The language that nonparent groups have the authority to nominate candidates from their respective groups immediately follows the directive that parents are to be informed of their "sole authority" to "decide on the composition of the council." That contrast and the distinctions between subdivisions (a)(1)(A) and (a)(2) of section 54444.2 support a construction that the second and third sentences in subdivision (a)(1)(A) are intended to clarify the role of parents in *electing* members to the RPACs.

the penultimate amendment to Assembly Bill No. 1384 (1981–1982 Reg. Sess.) (Assembly Bill 1382), the Legislature added the second and third sentences to subdivision (a)(1)(A) of section 54444.2 without adding similar language to subdivision (a)(2) pertaining to the statewide parent advisory council. Having independently reviewed that legislative history, we find that the legislative history does not clearly indicate an intent to define "composition" broadly to include member qualifications and the size and breakdown of RPACs. We therefore adhere to the interpretation dictated by contextual considerations and the apparent purpose of the statute.

"We rely on the legislative history of an ambiguous statute as dispositive only when that history is itself unambiguous." (*Medical Board v. Superior Court* (2003) 111 Cal.App.4th 163, 179.) "The members of the Legislature have no opportunity to disapprove legislative history, and the Governor has no chance to veto it. Legislative history directly represents only the views of the few actors in the legislative process, including lobbyists and committee staff people, who are intimately involved with particular legislation." (*J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1577–1578.) Only "[a] clear statement of intent allows a court to reasonably indulge the inference that the individual members of the Legislature may have given at least a little thought to the statement before voting on the bill." (*Id.* at p. 1579.)

Assembly Bill 1384, as originally proposed in March 1981, did not include section 54444.2 or any similar provision. But the bill was amended the following month to add the mandate that the Superintendent is to "take the steps necessary" to ensure "effective parental involvement" in the MEP, which included establishing RPACs. In that version of the bill, the only requirements for RPACs was that the "membership of each parent advisory

council shall be comprised of members who are knowledgeable of the needs of migrant children and shall be elected" by migrant parents, and that "[a]t least 75 percent of the members" of the RPACs "shall be the parents of migrant children." The bill also added language requiring the Superintendent to establish a statewide parent advisory council with the same requirements.

In early August 1981, the Legislature amended Assembly Bill 1382 to state, for both the RPACs and the statewide parent advisory council, that the members shall be "nominated and" elected by migrant parents. At the end of the month, however, the Legislature deleted the language "nominated and" in the paragraph regarding RPACs and added what would become the second and third sentences of subdivision (a)(1)(A) of section 54444.2 (i.e., "The composition of the council shall be determined by the parents at a general meeting to which all parents of pupils enrolled in the migrant program shall be invited. Parents shall be informed . . . that the parents have the sole authority to decide on the composition of the council"). The Legislature also added language providing nonparent groups nominating power over the RPACs. The Legislature did not remove "nominated and" from the paragraph concerning the state parent advisory council, meaning that migrant parents alone had the authority to nominate and elect members to the statewide parent advisory council.

Wendz argues that the late August 1981 amendments show that the Legislature "added a new guarantee for regional councils" in addition to providing migrant parents election power. But the amendments alone do not provide a "clear statement of intent" to grant migrant parents additional authority, as they do not define the scope of the terms "determine[]" or "decide on the composition." Given the timing and substance of the

23

amendments—the Legislature added the "[p]arents shall be informed . . . that the parents have the sole authority" language at the same time it added language providing nonparent groups the right to nominate candidates for the RPACs—we could just as easily infer that the Legislature intended to ensure that parents were aware that they alone have the authority to elect RPAC members.

Wendz points to nothing else in the statute's legislative history supporting her interpretation of section 54444.2. In our independent review of that history, we found only a few references to section 54444.2, and they shed little light on the correct interpretation of the terms "determine[]" or "decide on the composition" as used in the statute. The Legislative Counsel's Digest of Assembly Bill 1382 stated that the first amendment to Assembly Bill 1382 "would require the superintendent to take the steps necessary to assure effective parental involvement throughout the state migrant education program, as specified, including the requirement that parent advisory councils be established and consulted by the operating agencies and at the state level in a specified manner." The Legislative Counsel's Digest characterized subsequent amendments using the same language.

Similarly, the analyses of various versions of the bill prepared by the staffs of the Ways and Means Committee and the Subcommittee on Educational Reform generally state that the bill would require the Superintendent to take specified steps to establish regional parent advisory councils.

A document prepared by the Assembly Office of Research and introduced in the Senate, entitled "Concurrence in Senate Amendments," more specifically describes the provisions of section 54444.2 at issue. It states that the amendments to Assembly Bill 1382 "[s]pecify the composition

24

and selection process of parent advisory councils, further specify that at least 66% of the members of each advisory council . . . must be parents of migrant children . . . [and]. . .[¶]. . . [s]pecify that the composition of State Parent Advisory Council must be at least 2/3 parents of migrant children." Although the author uses the term "composition" to refer to one of the criteria for the makeup of the councils, this does not constitute a " 'clear statement of intent' " by the Legislature to provide migrant parents the sole authority to determine the overall structure of the RPACs, as the author is not purporting to interpret the term as used in the statute. (See *Medical Board v. Superior Court, supra*, 111 Cal.App.4th at p. 179; *J.A. Jones Construction Co. v. Superior Court, supra*, 27 Cal.App.4th at p. 1583 [statements in legislative history were "equivocal" and did "not qualify as a clear statement" of legislative intent].) Moreover, considering the clear purpose of the statute to ensure effective parental involvement in the MEP and the resulting statutory analysis discussed above, we decline to find that this passing reference to the "composition" of the parent advisory councils requires a construction of subdivision (a)(1)(A) of section 54444.2 as providing migrant parents broad authority to decide the makeup and size of the councils.

We are therefore left with no clear indication of the intent behind the amendments to section 54444.2 ultimately enacted.[6] Because the legislative

---

[6] The case relied on by Wendz—*People v. Watie* (2002) 100 Cal.App.4th 866—is distinguishable. There, the Third District construed former Penal Code section 12022.53 (*Watie*, at p. 884), which provides sentence enhancements for persons convicted of enumerated felonies who use a firearm in the commission of the crime. (Former Pen. Code, § 12022.53, subds. (b), (c), (d), added by Stats. 1998, ch. 936, § 19.5.) The defendant argued that the life term enhancement in former Penal Code section 12022.53 did not apply in cases where the shooting " 'was done in self-defense, perfect or imperfect.' " (*Watie*, at p. 883.) The Third District

history is itself ambiguous, it is not useful in construing section 54444.2, and it offers us no reason to depart from the interpretation of section 54444.2 suggested by contextual considerations and the purpose of the statute.

### c. Other Statutes that Use "Composition"

Wendz next argues that the use of "composition" in sections 69525, subdivision (a), and 99202, subdivision (b), supports her interpretation of section 54444.2. Section 69525, subdivision (a), provides that the auxiliary organization established by the Student Aid Commission (§ 69522, subd. (a)), "shall be governed by a board of directors nominated and appointed by the commission. . . . The commission shall determine the composition of the remainder of the board of directors, including both the size and categories of membership of the board." (§ 69525, subd. (a).) Section 99202 similarly provides that the "composition of each advisory board shall" be comprised of "[o]ne representative" from each of ten enumerated groups and agencies (§ 99202, subd. (b).) Wendz argues that because sections 99202 and 69525 "confirm[]" that the power to determine composition includes the size and categories of membership, the Legislature intended for compositional decisions under section 54444.2 to likewise encompass such matters.

"To understand the intended meaning of a statutory phrase, we may consider use of the same or similar language in other statutes, because

---

disagreed, finding that the plain language of former Penal Code section 12022.53 did not exempt imperfect self-defense. (*Id.* at p. 884.) The court found that the legislative history supported its interpretation because the "Legislature's use of perfect and imperfect self-defense in the various versions of the statute demonstrates it knew how to include and exclude these concepts when it so chose." (*Id.* at p. 885.) Thus, the language of the statute and the legislative history clearly showed an intent to exclude the concept of imperfect self-defense. Here, in contrast, the legislative history of section 54444.2 does not clearly define the terms we are tasked with interpreting.

26

similar words or phrases in statutes in pari materia ordinarily will be given the same interpretation." (*In re Bittaker* (1997) 55 Cal.App.4th 1004, 1009.) "Two ' "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object." ' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1091; see *Neville v. County of Sonoma* (2012) 206 Cal.App.4th 61, 76 [holding that Labor Code section 2924 had no bearing on the interpretation of Food and Agricultural Code section 2181 and Business and Professions Code section 12214, because it was not "related to" and did not have "the same purpose or objective" of those statutes].)

Section 69525 deals with the governance of an auxiliary organization that the Student Aid Commission established "for the purpose of providing operational and administrative services for the participation by the commission in the Federal Family Education Loan Program, or for other activities approved by the commission . . . ." (§ 69522.) It is part of a statutory scheme with the object of enhancing the effectiveness of state student aid programs. (§ 69500.) Section 99202 concerns the establishment of project advisory boards to further the legislative goal of developing teachers' subject matter and content knowledge. (§§ 99200, subd. (a)(1), 99202.) Those statutes do not address the specific educational needs of migrant children. Even if there may be some overlap in the subject matter of those statutes and the MEP, they do not have the same purpose. (§ 54440, subd. (b); see *Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 ["Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other"].) They are therefore not in pari materia, and are irrelevant.

Even if the statutes are in pari materia, canons of statutory instruction are not dispositive, and serve as " 'mere[] aids to ascertaining probable legislative intent.' " (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 585, 879.) Courts will not accord the same meaning to similar phrases if "a contrary intent appears." (*Scottsdale Ins. Co. v. State Farm Mutual Automobile Ins. Co., supra*, 130 Cal.App.4th at p. 899.) As previously discussed, the application of other principles of statutory construction to section 54444.2 reveals a legislative intent contrary to the broad definition of "composition" in sections 69525 and 99202.

We therefore conclude that the regulations do not conflict with migrant parents' authority to "determine[]" or "decide on" the "composition" of the RPACs. We thus turn to Wendz's remaining arguments.

### 4. *The Regulations Regarding Community Members Are Consistent with Section 54444.2*

Wendz next makes three arguments that the regulations conflict with certain provisions of section 54444.2, subdivision (a)(1)(A), that deal with community members. We consider and reject each in turn.

### a. *Definition of Eligible Community Member*

First, Wendz argues that California Code of Regulations, title 5, section 12010, subdivision (b)(1) conflicts with the provision in subdivision (a)(1)(A) of section 54444.2 that migrant parents nominate " '[a]ll other community candidates' " for the RPACs aside from school personnel and students, because the regulation includes a definition of " '[e]ligible community member.' " The regulation defines "[e]ligible community member" as "knowledgeable about the needs of migrant children, and is either an eligible migrant child or a professional working in the field of education and social and health services." (Cal. Code Regs., tit. 5, § 12010, subd. (b)(1).)

28

According to Wendz, this definition prevents parents from nominating the "vast majority" of community members.

Because Wendz is making a facial challenge to the validity of the regulation, she "can prevail only if the text of the regulation, on its face, is inconsistent with the relevant statute[s]." (*PacifiCare Life & Health Ins. Co. v. Jones* (2018) 27 Cal.App.5th 391, 403; see Gov. Code, § 11349, subd. (d) [" 'Consistency' means being in harmony with, and not in conflict with or contradictory to, existing statutes, court decisions, or other provisions of law"].) " 'A facial challenge is " 'the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the [law] would be valid.'* " ' " (*PacifiCare Life & Health Ins. Co. v. Jones*, at p. 403.)

Here, the regulation does not, on its face, conflict with section 54444.2, as it preserves parents' authority to elect eligible members and nominate community member candidates. Although the regulation may limit the community candidates that are eligible to serve as RPAC members, parents still have the authority to nominate and elect specific individuals from the community. (See *PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1310–1311 [regulation properly " 'fill[ed] up the details' " of the statutory scheme where it did not usurp manufacturers' authority to set specific goals in their paint stewardship plans; rather, it clarified that the manufacturer is to calculate a baseline and "set a goal based on a change in the baseline"].)

Wendz's assertion that the regulation conflicts with parents' authority to nominate "[a]ll other community candidates" requires us to find that the statute provides parents the authority to set RPAC member eligibility requirements. Indeed, Wendz argues that the statute provides migrant parents the authority "without restriction" to nominate all other community

29

candidates.  But as previously mentioned, section 54444.2 already imposes in subdivision (a)(1)(A) a requirement for member eligibility:  "The membership of each parent advisory council shall be composed of members who are knowledgeable of the needs of migrant children . . . ."  (§ 54444.2, subd. (a)(1)(A).)  This suggests that the Legislature did not intend the language that parents "shall" nominate "[a]ll other community candidates" to confer on parents the exclusive authority to set community member qualifications.  Instead, when read in context of the entire subdivision, that sentence and the one before it— "nonparent candidates shall be nominated by the groups they represent: teachers by teachers, administrators by administrators, other school personnel, and pupils by pupils" (§ 54444.2, subd. (a)(1)(A))—merely specify which groups have the power to nominate candidates from the general categories set forth in the statute.

We further observe that section 54444.2 does not prohibit the Superintendent from imposing additional eligibility requirements, nor does it state that requiring RPAC members be "knowledgeable of the needs of migrant children" is sufficient to ensure "effective" parental involvement in the MEP.  This lack of specificity in the statute and the Legislature's broad grant of authority to the Superintendent to "take the steps necessary" to ensure effective parental involvement in the MEP support the issuance of regulations that impose RPAC member eligibility requirements "more exacting than those already imposed by statute" (*County of San Diego v. Bowen* (2008) 166 Cal.App.4th 501, 512), as it demonstrates a legislative awareness that the Superintendent might determine that more exacting requirements are necessary to ensure effective parental involvement in the RPACs.

30

The language of section 54444.2 and its context therefore suggest that the Legislature did not intend to prohibit the Superintendent from establishing additional eligibility criteria for RPAC members. California Code of Regulations, title 5, section 12010, subdivision (b)(1) is therefore consistent with section 54444.2 and is a proper exercise of the Superintendent's authority under that statute.

### b. Members' Nominating Power

Wendz next argues that subdivision (a) of California Code of Regulations, title 5, section 12013 conflicts with the language in subdivision (a)(1)(A) of section 54444.2 that "the parents" are to nominate certain community candidates and other groups are to nominate community candidates from their respective groups. Wendz challenges the portion of the regulation that states "[i]ndividual RPAC members may nominate eligible community members to the RPAC." (Cal. Code Regs., tit. 5, § 12013, subd. (a).)

Contrary to Wendz's assertion, however, this portion of the regulation does not confer exclusive nominating power to existing regional council members, nor does it purport to provide individual council members the authority to nominate community member candidates from any of the groups enumerated in section 54444.2. Rather, the regulation is concerned with delineating the community member nomination process, and it provides, among other provisions, that "individual parent members of the RPAC shall solicit nominations for community member positions from the districts within its boundaries" and that "[e]ligible community members shall be nominated by the group they represent." (Cal. Code Regs., tit. 5, § 12013, subd. (a).) Thus, when read in context, the challenged portion of the regulation merely clarifies that individual regional council members are *permitted* to nominate

31

eligible community members to the RPACs. (See *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433 ["Ordinarily, the word 'may' connotes a discretionary or permissive act"].) Clarification of nomination procedures for RPACs is a matter which falls within the Superintendent's broad regulatory power under section 54444.2. (See, e.g., *PaintCare v. Mortensen, supra*, 233 Cal.App.4th at p. 1313 ["CalRecycle has 'filled up the details' to clarify the criteria for evaluation of manufacturer Plans"].) Thus, the regulation is consistent with section 54444.2.

### c. *Requirement that Two-Thirds of RPAC Members Be Parent Members*

Finally, Wendz argues that California Code of Regulations, title 5, section 12011, which imposes a three-member cap on community members (Cal. Code Regs., tit. 5, § 12011, subd. (a)), conflicts with the language in subdivision (a)(1)(B) of section 54444.2 that two-thirds of the members of RPACs "shall be parents." According to Wendz, the latter "reflects the Legislature's conscious decision to allow migrant parents to compose regional councils with as many as one-third of members who are not migrant parents." Thus, Wendz contends, the regulation conflicts with that statutory requirement because the three-member cap would effectively raise the two-thirds requirement in any situation where migrant parents choose to form a council with more than nine members. We disagree that the regulation conflicts with subdivision (a)(1)(B) of section 54444.2.

Subdivision (a)(1)(B) of section 54444.2 on its face is concerned with ensuring effective parental involvement in the RPACs by mandating a minimum number of parent members. (§ 54444.2, subd. (a)(1)(B).) Based on its plain language, that subdivision imposes a floor: "*At least* two-thirds of the members of each parent advisory council shall be the parents of migrant

32

children."  The subdivision does not state that *no more than* or *only* two-thirds of the RPAC members shall be parents, nor does it state that parents shall have the authority to determine whether one-third of the members of the RPACs will be nonparent members.  (*Ibid.*)  As the statute does not impose any limit on the number of parent members on RPACs, California Code of Regulations, title 5, section 12012 does not facially conflict with section 54444.2.  (*County of San Diego v. Bowen, supra*, 166 Cal.App.4th at pp. 511–512 [finding that an agency's regulation that imposed additional tallying requirements did not conflict with statute providing a statewide 1 percent manual postelection tally, because the latter statute did not expressly limit vote tallying].)

Wendz's argument depends on a finding that migrant parents have the "sole authority" to determine the makeup of the RPACs beyond the two-thirds parent members requirement.  But as previously discussed, subdivision (a)(1) of section 54444.2 provides migrant parents only the power to elect members and nominate certain candidates.  It is the Superintendent who has the authority to " 'fill up the details' " of the statute to effectuate the goal of ensuring effective parental involvement in the MEP (*Batt v. City and County of San Francisco, supra*, 184 Cal.App.4th at p. 171), which includes the authority to adopt regulations supplementing the statutory directives pertaining to the size and makeup of the RPACs.  Given the plain language of subdivision (a)(1)(B) to impose a mere floor and its placement within the subdivision granting the Superintendent broad discretionary authority, the Legislature has delegated to the Superintendent the power to impose requirements "more exacting than those already imposed by statute . . . ." (*County of San Diego v. Bowen, supra*, 166 Cal.App.4th at p. 511 ["The authority of an agency to alter or enhance the scope of existing statutory law

33

is primarily a question of Legislative intent"]; see also *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420 ["The Legislature can surely accomplish indirectly that which it could do directly"].) The Superintendent has properly exercised his discretionary authority under section 54444.2 by imposing a rule that in some situations would require migrant parents to form RPACs with more than two-thirds parent members.

Wendz points to the legislative history of the statute as support for her argument. This history shows that as originally proposed in Assembly Bill 1382, section 54444.2 would require that "[a]t least 75 percent of the members of each parent advisory council shall be the parents of migrant children." The staff of the Minority Ways and Means Committee objected to this version, stating that the federal MEP only required a "majority" of members on parents advisory councils be parent members. And the staff of the Subcommittee on Educational Reform proposed striking the words "[a]t least 75 percent" and substituting the words "[t]he majority" for the same reason, and additionally commented that "[i]t is difficult to see how the district's and school's sense of membership will be increased by mandating parent advisory councils (PAC's) that are 75 percent parents." The Legislature subsequently lowered this requirement to "[a]t least two-thirds" of the members.

Contrary to Wendz's contention, this history does not provide a "clear statement of intent" to reserve for parents the right to compose RPACs with as many as one-third members who are not parents. (See *J.A. Jones Construction Co. v. Superior Court, supra*, 27 Cal.App.4th at p. 1579.) The amendments suggest instead that the Legislature was compromising with objectors by lowering the 75 percent requirement to two-thirds instead of a majority. Accordingly, California Code of Regulations, title 5, section 12011

34

is a proper exercise of the Superintendent's authority to take the steps necessary to ensure effective parental involvement in the MEP.

## B. Reasonable Necessity of Regulations

Under the APA, "no regulation adopted is valid or effective unless . . . reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11342.2.) Wendz argues that the regulations are invalid because there is no substantial evidence to support the Superintendent's determination that the regulations were reasonably necessary to effectuate the purpose of section 54444.2. We disagree.

Wendz's emphasis on substantial evidence "obscures the principle that courts are deferential of an agency's determination of reasonable necessity." (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 315 (*Maxwell-Jolly*).) " '[R]easonable necessity . . . generally does implicate the agency's expertise; therefore it receives a much more deferential standard of review.' " (*Ibid.*) That said, a regulation "may" be declared invalid for lack of substantial evidence to support an agency's determination that the regulation is reasonably necessary to effectuate the purpose of the statute. (Gov. Code, § 11350, subd. (b)(1).) " 'Necessity' means the record of the rulemaking proceeding demonstrates by substantial evidence the need for a regulation to effectuate the purpose of the statute . . . that the regulation implements, interprets, or makes specific, taking into account the totality of the record." (Gov. Code, § 11349, subd. (a).)

In *Maxwell-Jolly*, the State Department of Health Care Services (Department) adopted regulations that set upper billing limits for providers of durable medical equipment and certain medical supplies to Medi-Cal recipients. (*Maxwell-Jolly, supra*, 199 Cal.App.4th at p. 291.) According to the Department, the regulations closed a loophole in Medi-Cal regulations,

under which some providers were purchasing discounted products, or obtaining them at no cost, and billing Medi-Cal for reimbursement without accounting for the actual product purchase prices. (*Ibid.*) The Department determined that the regulations were " 'necessary to prevent and curtail provider fraud and abuse' " regarding medical supplies and durable medical equipment. (*Id.* at p. 316.) An association of medical product suppliers challenged the regulations in a petition for a writ of mandate, which the trial court denied. (*Id.* at p. 291.) On appeal, the association argued that there was not substantial evidence supporting the reasonable necessity of the regulations because the Department did not actually produce evidence showing that fraud or abuse was occurring. (*Id.* at pp. 315–316.)

Our colleagues in Division 2 of this court disagreed that there was no substantial evidence supporting the Department's determination of reasonable necessity. (*Maxwell-Jolly, supra*, 199 Cal.App.4th at pp. 316–317.) The court first concluded that the loophole itself was substantial evidence to support the reasonable necessity of the regulations. (*Id.* at p. 316.) "Even if the Department had no evidence that any providers had yet to exploit this loophole, it would have been entitled to adopt the [regulations] to '*prevent*' abuse in the future under [Welfare and Institutions Code] section 14043.75." (*Id.* at pp. 316–317.) This court further found that statements the Department made in its initial and final statements of reasons supported its determination of reasonable necessity. (*Id.* at p. 317.) Those statements included that the Department " 'routinely reviews the billing practices of Medi-Cal providers' " and " 'conducts audits of providers' accounting and billing practices,' " that the regulations were " 'based on the findings of those reviews and audits,' " and that the Department's "investigations . . . 'reveal exploitation of the Medi-Cal reimbursement system by providers . . . .' "

(*Ibid.*) Finally, the court found that comments made by the public during the notice-and-comment period further supported the reasonable necessity of the regulations, as the comments suggested that fraud in the Medi-Cal program was rampant. (*Id.* at p. 294.) Thus, based on the loophole itself and the statements in the record, the court concluded that there was substantial evidence to support the reasonable necessity of the regulations to prevent and curtail fraud and abuse pursuant to Welfare and Institutions Code section 14043.75. (*Id.* at p. 318.)

Here, Wendz is challenging the regulations that place a limit on the number of parent and community RPAC members, that impose term limits on members, that provide a definition of "eligible community member," and that specify grounds for member disqualification.[7] The Superintendent adopted those regulations pursuant to section 54444.2 because of his determination that regulations were needed to "provide necessary guidance to assist all RPACs to operate effectively, meet statutory requirements, and safeguard the effectiveness of parent involvement at the regional and district level."

As in *Maxwell-Jolly*, the record in this case contains statements in the initial and final statements of reasons that provide factual support for the Superintendent's determination of the need for regulations to effectuate the purpose of section 54444.2. The Superintendent remarked in his initial statement of reasons that the CDE implements the MEP by "monitoring program compliance with program and fiscal requirements . . . ." and that "[d]uring routine compliance visits, the CDE has found that RPACs are often

---

[7] Wendz is also challenging the regulation prohibiting members' use of alternates. However, for the reasons discussed below, the prohibition is invalid, and we strike it from the regulations.

out of compliance with" the requirement that at least two-thirds of the members of each RPAC be parent members, and that "[i]n current practice, council membership varies greatly across regions and, at times, can include dozens of individuals." The Superintendent's initial and final statements of reasons provided that the "CDE program reviews" and "monitoring visits" revealed "many councils [were] dominated by the same non-parents' [sic] members across long periods of time[,]" which "has stifled and limited participation from new or current migrant parents and instead encouraged participation from former members, who no longer migrate nor do they have children eligible for the program." The Superintendent stated that the issues with the RPACs' statutory compliance and with limited opportunities for parent participation have emerged because local bylaws currently determine RPAC governance, and those bylaws "vary widely" in their provisions and effectiveness. These statements provide substantial evidence of the need for regulations regarding the size and makeup of RPACs to ensure effective parental involvement in the MEP.[8]

---

[8] The initial statement of reasons also declares that the regulations "will address the federal non-compliance findings for the MEP" but does not provide any information about those findings. Wendz argues that this bare assertion does not constitute substantial evidence of the necessity of the regulations. Wendz also argues that documents produced in the trial court reflecting at least some of the CDE's monitoring reviews show that no recent reviews predating the Superintendent's rulemaking found compliance issues with the RPACs.

We agree that the reference to federal non-compliance findings does not constitute substantial evidence of the reasonable necessity of the regulations. Even assuming that "federal non-compliance findings" refers to the 2011 report prepared by the U.S. Department of Education Office of Migrant Education, which we discuss later in the opinion, we do not consider that report in deciding whether substantial evidence supports the challenged regulations, because the report does not appear in the rulemaking file. We nonetheless find that there is substantial evidence in the record supporting

We further conclude that the need for *some* regulation was self-evident from the statute itself, given the paucity of standards in the Act that govern RPACs. (§ 54444.2, subd. (a)(1).) Even if the Superintendent had no evidence before him that parental involvement in the RPACs was currently ineffective or out of compliance with statutory requirements, the Superintendent was entitled to adopt regulations to "ensure" effective parental involvement in the MEP in the future under section 54444.2. (See *Maxwell-Jolly, supra*, 199 Cal.App.4th at pp. 316–317.) Indeed, the Superintendent concluded that the regulations would "safeguard" the effectiveness of parental involvement in the MEP, and that "clear rules" for governance of the RPACs and for elections would "maximize" parent participation and "encourage" cooperative governance among council members and with the operating agencies.

The case upon which Wendz relies as support for her argument that there is no substantial evidence of reasonable necessity—*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463—does not compel a different conclusion. There, the State Water Resources Control Board (Board) adopted a regulation that was likely to require a reduction in diversion of water from the stream system for frost protection. (*Id.* at p. 1472.) The Board adopted the regulation to protect salmonids in the stream system from stranding mortality due to sudden drops in water level. (*Id.* at p. 1495.) The trial court found no substantial evidence to support the Board's

the Superintendent's determination of reasonable necessity. The record suggests that the CDE's findings from its "routine" compliance reviews and monitoring visits cited by the Superintendent in his initial notice are independent of the OME's findings in the 2011 report. And the CDE monitoring review documents produced by respondents does not mean that CDE staff did not make oral reports of their compliance review findings regarding issues with the RPACs.

finding of regulatory necessity, concluding that the Board had not collected sufficient data to demonstrate the need for the regulation. (*Ibid*.)

On appeal, this court concluded that while it was "uncertain from the record precisely what type of regulation of frost protection diversion [was] necessary to protect salmonids, the need for some type of regulation [was] supported by substantial evidence." (*Light v. State Water Resources Control Bd., supra*, 226 Cal.App.4th at p. 1497.) The four scientific studies the Board relied on in adopting the regulation did not directly connect salmonid strandings with water diversion for frost protection, but the court concluded that the Board made reasonable inferences associating salmonid mortality with the sudden declines observed during periods of low temperature and connecting those declines with diversion for the purpose of frost protection. (*Id.* at pp. 1496–1497.) "Giving due deference to the Board's expertise, and recognizing our obligation to resolve conflicts and draw inferences in the Board's favor, we conclude the foregoing provides substantial evidence to support the Board's conclusion that some regulation of growers' diversion of water for frost protection was necessary to prevent unwarranted salmonid mortality." (*Id.* at p. 1496.)

So too, here, the Superintendent reasonably inferred from the lack of consistent rules governing the RPACs and from CDE compliance reviews and monitoring visits that some regulation of the size and makeup of the RPACs was necessary to ensure effective parental involvement in the MEP, even if it is not clear from the record the precise regulations needed to accomplish that goal. We cannot substitute our own deductions for those of the agency. (*Light v. State Water Resources Control Bd., supra*, 226 Cal.App.4th at p. 1495.)

Wendz argues that the Superintendent could not rely on the references in the initial and final statements of reasons to "routine compliance visits," "program reviews," and "monitoring visits," but instead was required to present "support" for those reviews and visits. But Wendz does not cite any legal authority in support of this assertion, nor does she argue that the Superintendent in his rulemaking capacity was required to follow formal rules of evidence. Here, as we have indicated, the Superintendent needed only to provide some factual basis in the administrative record for his determination that the regulations were reasonably necessary to effectuate the purpose of section 54444.2. (See Gov. Code, § 11349, subd. (a) ["evidence" of " '[n]ecessity' " includes "facts"]; *Maxwell-Jolly, supra*, 199 Cal.App.4th at p. 317.)

Wendz further argues that even if substantial evidence existed showing noncompliance with the statutory requirement that at least two-thirds of the RPAC members must be parent members, the Superintendent made no showing that the regulations will "have any effect on whether regional councils comply with existing proportionality requirements." However, an agency is entitled to make its own policy judgment on how best to implement its regulatory authority. "Our function in passing upon the efficacy of the *means* employed by the agency to effectuate the statutory purposes is . . . a very limited one . . . '[A court] will not ... superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision'.... [¶] Nor, in reaching this conclusion, can we consider alternative methods of regulation available to the department." (*Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172, 179–180.) Because Wendz does not contend that the regulations are not rational or that they are arbitrary and capricious, we assume without deciding that the regulations were a rational response to the

41

Superintendent's efforts to ensure effective parental involvement in the MEP, and were not arbitrary or capricious.

Accordingly, we have no basis for invalidating the regulations for lack of reasonable necessity.

## C. Compliance with the APA

A regulation "may be declared to be invalid for a substantial failure to comply with [the APA] . . . ." (Gov. Code, § 11350, subd. (a).) Wendz argues that the trial court erred in upholding the regulations because the Superintendent failed to substantially comply with four of the APA's procedural requirements in adopting the regulations. First, she argues that the Superintendent failed to comply with Government Code section 11346.2, because he did not disclose in his initial statement of reasons that he relied on a 2011 report from the U.S. Department of Education Office of Migrant Education in proposing the adoption of the regulations. Second, she contends that the Superintendent's initial statement of reasons failed to describe and justifiably reject reasonable alternatives available to the Superintendent at that time. (Gov. Code, § 11346.2, subd. (b)(4).) Third, and relatedly, Wendz argues that the Superintendent's final statement of reasons failed to describe and justifiably reject reasonable alternatives presented to him through the notice-and-comment period. (Gov. Code, § 11346.9, subd. (a)(4).) Finally, Wendz argues that the Superintendent failed to give the public a 45-day notice of a proposed regulation prohibiting RPAC members' use of alternates. (Gov. Code, § 11346.4, subd. (a).) Reviewing the Superintendent's compliance with those rule-making procedures de novo (*California Advocates for Nursing*

*Home Reform v. Bonta* (2003) 106 Cal.App.4th 498, 506), we conclude that only the latter argument has merit, and so we begin with that contention.

### 1. *The Superintendent Failed to Give the Public the Requisite 45 Days' Notice of the Prohibition on Alternates.*

The prohibition on RPAC members' use of alternates is found in subdivision (a) of California Code of Regulations, title 5, section 12011. Initially, the proposed text of the regulation stated that "[t]he RPACs shall be comprised of ten eligible parent members and three community members . . . ."  The initial statement of reasons noted that currently, council membership "varies greatly across regions and, at times, can include dozens of individuals."  Therefore, the purpose of the proposed rule was to "limit RPAC membership" in order to "ensure efficient and effective meetings" and to "ensure the RPAC functions as a decision-making body for the larger program rather than the current practice which is a large parent meeting that does not include representative governance."

After receiving several comments on the proposed regulations, including a couple of comments urging the Superintendent to allow members to use alternates, the Superintendent issued a 15-day notice of modifications to the text of the proposed regulation.  As pertinent here, the Superintendent amended the proposed regulation to increase eligible parent members up to 15 and to "specify" that alternate members were not allowed.  The final rule stated in relevant part that "[t]he RPAC shall be comprised of up to 15 eligible parent members with no alternate members."  (Cal. Code Regs., tit. 5, § 12011, subd. (a).)

Wendz argues that the trial court erred in holding that the Superintendent did not need to provide the minimum 45-day notice required under Government Code section 11346.4 for proposed regulatory action for

43

the modification prohibiting alternates. In response, respondents argue that the modification was "sufficiently related" to the original text such that they only needed to provide a 15-day notice under Government Code section 11346.8, subdivision (c).

### a. *The Law Governing Notice in APA Rulemaking*

Government Code section 11346.4 provides that "[a]t least 45 days prior to the hearing and close of the public comment period on the adoption . . . of a regulation," notice of the proposed action "shall" be mailed to specified individuals and entities, published in the California Regulatory Notice Registrar, and posted on the state agency's website if the agency has a website. (Gov. Code, § 11346.4, subd. (a).) Under Government Code section 11346.8, the agency cannot adopt a regulation which has been changed from that which was originally made available to the public in the notice, "unless the change is . . . sufficiently related to the original text that the public was adequately placed on notice that the change could result from the originally proposed regulatory action." (Gov. Code, § 11346.8, subd. (c).) If the change is a "sufficiently related" change, then the agency must make the full text of the resulting regulation available to the public "for at least 15 days before the agency adopts . . . the resulting regulation." (*Ibid.*)

The parties cite no case, and we are aware of none, determining when an amendment to a regulation is "sufficiently related" to the original text under Government Code section 11346.8 such that the public had adequate notice of the potential modification. Several federal cases have addressed the issue of adequate notice in the rulemaking context under the federal version of the APA. Wendz has relied on one such case—*Long Island Care at Home, Ltd. v. Coke* (2007) 551 U.S. 158—as support for her argument. At issue in *Long Island Care* was a Labor Department regulation interpreting a Fair

44

Labor Standard Act (FLSA) provision exempting from the FLSA's minimum wage and maximum hour rules "companionship" workers. (*Long Island Care at Home, Ltd. v. Coke*, at p. 158.) The Labor Department initially proposed a rule that would have placed outside the exemption individuals employed by third-party employers. (*Id.* at p. 174.) The final regulation, however, exempted all third-party-employed companionship workers from the FLSA. (*Long Island Care at Home, Ltd. v. Coke*, at pp. 158, 175.) The respondent argued that this regulation violated the federal APA because the notice-and-comment procedure leading to the promulgation of the regulation provided inadequate notice. (*Id.* at p. 174.)

In determining whether there was adequate notice, the Court first noted that the federal APA requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking " 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.' " (*Long Island Care at Home, Ltd. v. Coke, supra*, 551 U.S. at p. 174.) "The Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be 'a "logical outgrowth" of the rule proposed.' " (*Ibid.*) "The object, in short, is one of fair notice." (*Ibid.*) The Court concluded that it was "reasonably foreseeable" that the Labor Department, after considering the matter, would withdraw the proposed regulation for "special treatment of employees of 'covered enterprises,' " and therefore notice was not inadequate. (*Id.* at p. 175.)

The reasoning *of Long Island Care at Home, Ltd. v. Coke, supra,* 551 U.S. 158 is consistent with the concept of adequate notice in the rulemaking context articulated by our Supreme Court in a case that involved rulemaking that occurred prior to the enactment of Government Code section 11346.8. In *Western Oil & Gas Ass'n v. Air Resources Board* (1984) 37 Cal.3d 502, the

45

State Air Resources Board (ARB) adopted standards for sulfates pursuant to its authority to adopt standards of ambient air quality. (*Id.* at pp. 507–508.) The initial notice stated that the " 'staff's data tend to confirm the validity of the previously adopted .04 ppm standard, or a more stringent standard,' " and that the ARB would consider all evidence, including evidence supporting a more stringent or lenient standard. (*Id.* at p. 526.) The trial court concluded that the notice "should have proposed a specific standard and if the evidence at the hearing showed that some other standard was appropriate, a new notice followed by a hearing would be required." (*Ibid.*)

Our high court disagreed: "To require a new notice and hearing would tie the agency into time consuming, circular proceedings transcending the statutory purpose: to advise the public of the subject under consideration and to afford a reasonable opportunity to present evidence, views and arguments. Accordingly, the regulation adopted need not be the same as that proposed as long as it deals with the same subject or issue dealt with by the notice." (*Western Oil & Gas Ass'n v. Air Resources Board, supra*, 37 Cal.3d at p. 526.) In the case before it, the court found that the standard adopted by the ARB "clearly deals with the subject mentioned in the notices, and the notices were not so broad as to preclude effective comment by plaintiffs and other members of the public." (*Id.* at p. 527.) "The determination of the appropriate standard can only be made by comparing it to other potential standards, and no matter how many hearings are held, essentially the same weighing process will be required." (*Ibid.*)

The court cited with approval *Schenley Affiliated Brands Corp. v. Kirby* (1971) 21 Cal.App.3d 177, superseded by statute on another ground as stated in *Western Growers Assn. v. Occupational Safety & Health Standards Bd.* (2021) 73 Cal.App.5th 916, 933, fn. 4. (*Western Oil & Gas Ass'n v. Air*

46

*Resources Board, supra*, 37 Cal.3d at p. 526.) There, the Department of Alcoholic Beverage Control amended a regulation to restrict wholesalers in the varieties and rates of discounts offered from the single-case price of distilled spirits. (*Schenley Affiliated Brands Corp. v. Kirby*, at p. 182.) The petitioners argued that the amended regulation the agency ultimately adopted "differed widely from that described in the notice . . . ." (*Id.* at pp. 191, 193.) In determining the adequacy of the notice, the court held that the agency was not confined substantially to the proposal described in the published notice: "A prime objective is to persuade the agency into action differing from its pre-hearing proposal. . . . [¶] Thus, eventual adoption of a regulation differing from that described in the pre-hearing notice is one objective of the hearing process. Fairness too is a statutory desideratum. After an opportunity for participation in a hearing considering the subject or issue evoked by the pre-hearing draft or summary, affected interests cannot claim unfairness when the agency's consideration of new information and views persuades it into a different enactment dealing with the identical subject or issue." (*Id.* at p. 193.) The court concluded that the notice was adequate because it "sufficiently communicated awareness of proposed restrictions upon the number and kinds of discounts to be filed[,]" and the final rule "dealt with the very subject or issue evoked by the notice of hearing." (*Ibid.*)

Government Code section 11346.8, enacted almost a decade after the *Schenley* decision, appears to codify the standard for adequate rulemaking notice in that case, as it prohibits the adoption of a final rule different than that originally proposed unless it is "sufficiently related" to the original text such "that the public was adequately placed on notice that the change could result from the originally proposed regulatory action." (Gov. Code, § 11346.8,

47

subd. (c); see *Pacific Intermountain Express v. National Union Fire Ins. Co.* (1984) 151 Cal.App.3d 777, 783 ["the Legislature is presumed 'to have knowledge of existing judicial decisions and to have enacted statutes in light thereof' " absent a clear intent to the contrary].)

### b. *Application of Notice Principles to this Case*

Applying the principles of the notice cases, we must focus on whether the final rule adopted by the Superintendent concerned the same subject or issue as the initial notice and whether the Superintendent made his views known in a " 'concrete and focused form so as to make criticism or formulation of alternatives possible.' " (*Small Refiner Lead Phase-Down Task Force v. United States E.P.A.* (D.D.C. 1983) 705 F.2d 506, 548; see *Western Oil & Gas Ass'n v. Air Resources Board, supra*, 37 Cal.3d at pp. 526–527; *National Black Media Coalition v. F.C.C.* (2d Cir. 1986) 791 F.2d 1016, 1023 [" '[u]nfairness results unless persons are "sufficiently alerted to likely alternatives" so that they know whether their interests are "at stake" ' "].)  If the notice does not provide any "specific indication" of the changes the Superintendent might try to make, or if the final rule concerns a different issue altogether, notice may be inadequate because commenters will be "hampered in effectively opposing those changes." (*Small Refiner Lead Phase-Down Task Force v. E.P.A*, at p. 548.)

We conclude that the original text of the regulation and the notice of proposed regulations did not provide the public adequate notice of the final rule.  The initial rule placed a cap on the number of members; it does not, on its face, address members' use of alternates.  And the notice of proposed rulemaking provides no specific indication that the Superintendent might prohibit the use of alternates.  It focuses instead on the problems arising from RPAC meetings that involve a large number of members, and it

specifies in detail other issues with parent member participation. This specificity, together with total silence concerning members' use of alternates, indicates that alternates were not at issue. (See *Chocolate Mfrs. Ass'n of U.S. v. Block* (4th Cir. 1985) 755 F.2d 1098, 1106–1107 [finding that the agency did not provide adequate notice that elimination of flavored milk would be considered in rule-making procedure where discussion in preamble to proposed rule was detailed and identified specific foods which agency was examining for excess sugar].) In comparison, the final rule places a cap on the number of members *and* prohibits the use of alternates, thereby imposing an additional restriction on migrant parents. (Cal. Code Regs., tit. 5, § 12011, subd. (a).)

Although in some cases courts have found adequate notice of a final rule that imposes different or additional measures than those originally proposed, the proposed rule and the changes to the rule addressed the same issue. (See, e.g., *South Terminal Corp. v. E.P.A.* (1st Cir. 1974) 504 F.2d 646, 656–657 [finding that the final rule, which added transportation controls different than those in the proposed rule, was in "character with the original scheme" because both the proposed and final regulations "stress VMT reducing controls"].) That is not the case here, because the final statement of reasons states that the prohibition on alternates was necessary to address "inconsistent attendance" and to ensure the members are "fully informed and up-to-date on discussion topics at every meeting," issues the Superintendent did not identify in the initial statement of reasons. Under these circumstances, it cannot be said that the public had adequate notice that the

Superintendent might adopt a regulation prohibiting the use of alternates by RPAC members.[9]

Because the prohibition on alternates was not a "sufficiently related" change under Government Code section 11346.8, subdivision (c), the Superintendent was required to provide the public 45 days' notice under Government Code section 11346.4, subdivision (a). He failed to do so. The trial court therefore erred in finding that the prohibition on alternates was valid, and we strike it from section 2011, subdivision (a).[10] (Gov. Code, § 11350, subd. (a).)

---

[9] Although, as noted, there were a couple of comments prior to the 15-day notice urging the Superintendent to allow alternates, the Superintendent " 'cannot bootstrap notice from a comment.' " (*Fertilizer Institute v. U.S. E.P.A.* (D.D.C. 1991) 935 F.2d 1303, 1312.) It is the Superintendent's responsibility to provide adequate notice of a regulatory proposal. (*Ibid.*; Gov. Code, § 11346.8, subd. (c) [a final rule must be "sufficiently related" to the "*original text,*" italics added].)

[10] The parties do not address the issue whether we can sever the prohibition on alternates from the rest of the regulation, although the issue is necessarily raised by Wendz's argument that the prohibition on alternates is invalid. Because the prohibition on alternates is grammatically severable and its severance "would not change or alter the substance" of the rest of the regulation, which is valid, we conclude that the proper remedy is to sever the prohibition. (*Pulaski v. California Occupational Safety and Health Standards Board* (1999) 75 Cal.App.4th 1315, 1342 [finding that a small employer exemption in a regulation imposing requirements to address repetitive motion injuries in the workplace was an abuse of the agency's rulemaking discretion, and severing the exception from the rest of the regulation].) Thus, there is no reason to return the entire regulation to the Superintendent for more rulemaking, and the regulation should go into effect with the prohibition on alternates deleted.

### 2. *The Superintendent Was Not Required to Disclose the 2011 OME Report in His Initial Statement of Reasons*

Wendz argues that the Superintendent failed to substantially comply with the APA because he did not disclose in his initial statement of reasons a 2011 report prepared by the U.S. Department of Education Office of Migrant Education (OME) that he allegedly relied on in adopting the regulations. Respondents disagree that this omission violated the APA, because Government Code section 11346.2 only requires disclosure in the initial statement of reasons of "each technical, theoretical, and empirical study, report, or similar document, if any, upon which the agency relies in proposing the adoption . . . of a regulation[,]" and the OME report is not a technical, theoretical, or empirical report. We conclude that respondents have the better argument.[11]

#### a. *Factual and Procedural Background*

In September 2011, the OME transmitted to the Superintendent the its findings from its monitoring review of the CDE's compliance with the federal

---

[11] In addition to Government Code section 11346.2, Wendz cites as support for her argument *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059 (*Sims*) for the proposition that one of the procedural requirements of the APA "is to disclose 'the information or documents the agency relied upon in proposing . . . the regulation.' " The *Sims* court, however, did not determine whether the agency violated the requirement in Government Code section 11346.2 that the initial statement of reasons disclose certain documents relied upon by the agency in proposing the regulation. The language quoted by Wendz reflects the *Sims* court's general discussion of the procedural requirements of the APA. (*Sims*, at p. 1074.) Wendz also notes that the *Sims* court invalidated the regulations in part because the agency did not substantially comply with the requirement that the " 'rulemaking file' " is to "disclose" documents the agency relied on in drafting the regulations. In doing so, the court relied on Government Code section 11347.3, which pertains to the required contents of the rulemaking file. (*Sims*, at pp. 1066–1067.) However, Wendz does not address Government Code section 11347.3 in her appellate briefs, nor does she argue

MEP grant program (the OME report). The federal MEP's purpose is to assist states in meeting the special educational needs of migrant children. States are to use federal MEP funds to carry out this purpose by establishing and improving education programs for migrant children. The OME report provides an overview of the California MEP and discusses its areas of noncompliance with the federal MEP and the required corrective actions.

As relevant to this appeal, one of the areas of noncompliance identified in the OME report is parent advisory councils. According to the report, the OME notified the CDE that it had received numerous complaints concerning the governance, operations, and actions of the state parent advisory council, and about staff misconduct at the state and regional levels. The CDE investigated the complaints by collecting and examining emails, letters, and meeting minutes, and concluded from those documents that the state parent advisory council failed to comply with notice and agenda requirements. Additionally, the CDE concluded that the council executive members interfered with member participation in meetings by, among other things, passing bylaws that unlawfully removed members and prohibited members from voting and otherwise participating in meetings. The CDE further found that the state parent advisory council did not comply with the two-thirds

---

in her opening brief that the Superintendent was required to and failed to include the 2011 OME report in the rulemaking file. Rather, her argument focuses on the fact that the Superintendent's initial statement of reasons does not disclose the report. Our review is limited to those issues that have been adequately raised and supported in Wendz's brief. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.) To the extent her reply brief attempts to make up for this shortcoming by arguing that "the failure to disclose that report in the administrative record violated the APA," she is too late. (*Eyford v. Nord* (2021) 62 Cal.App.5th 112, 126 ["arguments made in a reply brief for the first time are too late"].)

parent member requirement. The OME concluded from the CDE's findings that the "continued dominance of [state parent advisory council] by non-parent members" was a "serious impediment to the effective involvement of parents of migrant children in the MEP." Although the OME report largely concerns issues with the state parent advisory council, the OME concluded that the CDE's failure to correct the identified issues was "likely to result in the continued dysfunctional operation of the [state parent advisory council] and regional PACs in California until CDE has addressed the problems it identified."

As Wendz points out, the Superintendent did not mention the OME report in his initial statement of reasons. Under the heading "Studies, Reports or Documents Relied Upon – Gov. Code Section 11346.2(b)(3)," his initial statement of reasons states that he "did not rely upon any technical reports or documents, including theoretical or empirical studies, in proposing the adoption of these regulations."

In the trial court, however, respondents argued in their opposition to the petition for writ of mandate that the OME report and the evidence in the administrative record "supports the Superintendent's and CDE's lawful promulgation of regulations . . . ." Respondents cited the facts in the report that the OME had received complaints about the misconduct of regional and state MEP staff, that RPACs had similar issues to the state parent advisory council, including non-parent members "hindering effective parental involvement at the regional level," and that the OME had concerns about the operation of RPACs.

In her reply, Wendz argued that the Superintendent was attempting to cure his noncompliance with subdivision (b) of Government Code section 11346.2 by adding the OME report to the record after the fact.

53

The trial court concluded that the Superintendent did not have to support his initial statement of reasons with documents.  It noted that subdivision (b)(3) of Government Code section 11346.2 requires the identification of a " 'document, *if any*, upon which the agency relies in proposing . . . a regulation.' "  Because the Superintendent relied on oral reports of "routine compliance visits" and "program reviews" by CDE staff to support the regulations, the trial court concluded that the Superintendent's "reliance was lawful and their stated reasons sufficed."

### b. *The Report Does Not Fall Within the Scope of Government Code Section 11346.2.*

The APA requires the agency to prepare and make available to the public an initial statement of reasons for proposing the adoption of a regulation.  (Gov. Code, § 11346.2, subd. (b).)  The initial statement of reasons "shall include, but not be limited to" certain information not at issue here (Gov. Code, § 11346.2, subd. (b)(1), (2), (4)) and an "identification of each technical, theoretical, and empirical study, report, or similar document, if any, upon which the agency relies in proposing the adoption . . . of a regulation" (Gov. Code, § 11346.2, subd. (b)(3)).

The parties disagree on the meaning of the term "empirical" as used in subdivision (b)(3) of Government Code section 11346.2.  Wendz argues in her reply that the dictionary definition of "empirical" is "originating in or based on observation or experience," and thus the report was an empirical report because it made factual findings based on observation or experience.  Respondents suggest a narrower construction of "empirical" based on an interpretation of that term in the context of the entire subdivision.  We therefore begin our analysis by giving the statutory language its ordinary

54

meaning.  (*California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 167.)

Dictionary definitions of the term "empirical" vary, including the definition relied on by Wendz—"originating in or based on observation or experience."  (Merriam-Webster < https://www.merriam-webster.com/dictionary/empirical> [as of March 28, 2023].)  In arguing that the report falls within this definition, Wendz cites the OME's findings of the CDE's noncompliance with various areas of the federal MEP grant program. Those findings are based, at least in part, on observations and experience, in the sense that the OME received information from the CDE and third parties regarding the CDE's compliance with the program and formed opinions based on that information and its expertise.  Thus, when the term "empirical" is viewed in isolation, it is difficult to dispute that the term is arguably susceptible to Wendz's interpretation.

However, when viewed in context of the entire subdivision, the word "empirical" takes on a narrower meaning.  (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 169 ["words used in a statute are considered in context, not in isolation"].)  Government Code section 11346.2, subdivision (b)(3) refers to an "empirical *study, report, or similar document*." (Gov. Code, § 11346.2, subd. (b)(3), italics added.)  An "empirical study" is commonly understood to mean a research study that relies on empirical evidence; it is designed to test a theory or hypotheses by collecting independently verifiable data or information and making conclusions based on that information.  (See, e.g., Eisenberg & Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study* (2006) 53 UCLA L.Rev. 1302; *Merchants' Responses to Shoplifting: An Empirical Study* (1976) 28 Stan. L.Rev. 589; Notes, *Testing Three Commonsense Intuitions About Judicial*

*Conduct Commissions* (2012) 64 Stan. L.Rev. 1021; see also Webster's 9th New World College Dictionary (1989) [defining "empirical" as "relying or based solely on experiment and observation rather than theory," as in "the empirical method"].)  Empirical studies set forth the methodology used, which is important in the context of APA rulemaking because it allows the public to test the accuracy and reliability of the study results.  (See *Portland Cement Ass'n v. Ruckelshaus* (D.D.C. 1973) 486 F.2d 375, 392–393, superseded by statute on other grounds as stated in *American Trucking Ass'ns, Inc. v. United States EPA* (D.D.C. 1999) 175 F.3d 1027 [remanding to the agency for further review where the agency failed to make available to the public the test methodology used on existing cement plants which formed a partial basis for the emission control level adopted by the agency].)

A reading of the term "empirical" in Government Code section 11346.2 as referring to a specific type of research study comports with the statutory construction doctrine of *noscitur a sociis*.  Under the rule of *noscitur a sociis*, "[a] word of uncertain meaning may be known from its associates and its meaning 'enlarged or restrained by reference to the object of the whole clause in which it is used.' " (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 203.)  " 'In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307.)  From this perspective, the term "empirical" is best interpreted in light of its semantic relationship to the terms "theoretical" and "technical."

In reviewing the common meanings of the three terms, a central theme emerges. The terms "theoretical" and "empirical" are commonly used to refer to different methods of research. (See *People v. Giani* (1956) 145 Cal.App.2d 539, 543 [explaining how research in "sexual deviation" has been "theoretic and speculative rather than empiric"]; Dictionary.com <https://www.dictionary.com/compare-words/empirical-vs-theoretical> [as of March 26, 2023].) And the term "technical report" ordinarily refers to a report that discusses the results of technical or scientific research. (See, e.g., OEHHA Defends Use of NTP Reports in Listing Decisions (2003) vol. 17, No. 4, Cal. Envtl. Insider 16 [discussing how the results of studies designed by the National Toxicology Project on toxic chemicals are published as technical reports]; *Barclay Hollander Corp. v. California Regional Water Quality Control Bd.* (2019) 38 Cal.App.5th 479, 490 [noting that company "conducted the requested environmental investigation, including collecting analytical data, and compiled technical reports based on 2,400 samples taken at several locations on the Site"].) Together, these terms refer to different types of research reports or studies. Therefore, in using the term "empirical," it appears that the Legislature intended to require agencies to identify in their initial statement of reasons documents similar to an empirical study, rather than any report that contains findings based on a party's observations or experience.

Moreover, in construing the term "empirical" in the context of the entire statutory scheme, we observe that a different statute concerning APA procedural requirements uses an almost identical phrase. Subdivision (b) of Government Code section 11347.3, which concerns the required contents of the "rulemaking" file, requires the inclusion of "technical, theoretical, and empirical studies or reports" relied on by the agency in adopting the

regulation.  (Gov. Code, § 11347.3, subd. (b)(7).)  It also requires, in a separate subdivision, the inclusion in the rulemaking file of "[a]ll data and other factual information" submitted to the agency or relied on by the agency in adopting the regulation, thus distinguishing between that category of information and "technical, theoretical, and empirical" reports.  (Gov. Code, § 11347.3, subds. (b)(6), (b)(7).)  Only the latter must be identified in an initial statement of reasons, whereas the rulemaking file must additionally contain "[a]ll data and other factual information" relied on by the agency.  Where, as here, "the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended."  (*Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 894.)

Based on the foregoing, we conclude that the OME report is not the type of report contemplated by subdivision (b)(3) of Government Code section 11346.2.  It does not concern technical, theoretical, or empirical research.[12] Rather, the report is more properly classified as "other factual information," as it discusses the OME's opinions on respondents' compliance with the federal MEP program based on information it received from third parties and the proper corrective actions for any noncompliance.  (See *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 752–753 [e-mails to

---

[12] Wendz further argues that even if the report is not an empirical report, it falls within the "catchall" phrase "or similar document" in subdivision (b)(3) of Government Code section 11346.3.  But given the syntax of that subdivision, the phrase "technical, theoretical, and empirical" modifies "study, report, or similar document."  Thus, a document must be similar to a technical, theoretical or empirical study or report to fall within the scope of subdivision (b)(3) of Government Code section 11346.3.  For the reasons discussed above, that is not the case here.

agency from its technical consultants contained "factual information" as that term is used in Government Code section 11347.3, subdivision (b)(6), because they conveyed "nonopinion information," " 'knowledge of a particular event or situation,' " and a "narrative" of the experts' opinions].)  As mentioned, only "technical, theoretical, or empirical" reports are required to be disclosed in the initial statement of reasons.  (See *Pulaski v. California Occupational Safety and Health Standards Board, supra*, 75 Cal.App.4th at pp. 1330–1331 ["the fact that the Board cited only six documents [in its initial and final statements of reasons] is not determinative, given that it was not required to cite any"].)

Accordingly, the Superintendent's failure to disclose the OME report in his initial statement of reasons does not constitute substantial noncompliance with the APA.

### *3. The Superintendent Complied with the APA Requirements Concerning Reasonable Alternatives.*

Wendz next argues that the Superintendent failed to comply with the APA because his initial statement of reasons failed to describe and justifiably reject reasonable alternatives available to him at the time, and his final statement of reasons failed to describe and justifiably reject reasonable alternatives presented to him through the notice-and-comment period.

### *a. Initial Statement of Reasons*

We first consider the Superintendent's initial statement of reasons. Government Code section 11346.2, subdivision (b)(4) provides that an initial statement of reasons "shall" include "[a] description of reasonable alternatives to the regulation and the agency's reasons for rejecting those alternatives. Reasonable alternatives to be considered include, but are not limited to, alternatives that are proposed as less burdensome and equally

59

effective in achieving the purposes of the regulation in a manner that ensures full compliance with the authorizing statute or other law being implemented or made specific by the proposed regulation." (Gov. Code, § 11346.2, subd. (b)(4).) Notwithstanding this requirement, "an agency is not required to artificially construct alternatives or describe unreasonable alternatives." (Gov. Code, § 11346.2, subdivision (b)(4)(C).)

In his initial statement of reasons, under the heading "Reasonable Alternatives Considered or Agency's Reasons for Rejecting Those Alternatives," the Superintendent stated that "[n]o other alternatives were presented to or considered by the SSPI." Wendz interprets this statement as the Superintendent admitting that he did not consider alternatives, and she argues that the failure to do so is "inexcusable" because section 54444.2, subdivision (a)(5) already requires the Superintendent to " 'establish and implement training programs for members of the statewide and [regional] parent advisory councils to enable them to carry out their responsibilities.' " The Superintendent disagrees that he failed to substantially comply with Government Code section 11346.2, because there were no reasonable alternatives to consider, and he was not obligated to artificially construct or describe unreasonable alternatives. Based on the record before us, we agree with the Superintendent.

"Substantial compliance with a statute is dependent on the meaning and purpose of the statute." (*Freeman v. Vista de Santa Barbara Associates LP* (2012) 207 Cal.App.4th 791, 793.) Thus, "noncompliance [with the APA] is insubstantial, or 'harmless,' only where it does not compromise any 'reasonable objective' of the APA." (*Sims, supra*, 216 Cal.App.4th at p. 1073.) The objectives of the APA are " 'to provide a procedure whereby people to be affected may be heard on the merits of the proposed rules' " and to ensure

" 'meaningful public participation in the adoption of administrative regulations by state agencies.' " (*Ibid.*)

Here, there is no evidence in the record that any reasonable alternatives to the regulations existed at the time the Superintendent issued his initial statement of reasons. Thus, his failure to describe any reasonable alternatives in his initial statement of reasons does not constitute substantial noncompliance with the APA because there is no evidence that the failure deprived individuals or groups affected by the regulations of meaningful participation in the adoption of the regulations. (*Sims, supra*, 216 Cal.App.4th at p. 1073; see also *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 207–208 [trial court's failure to comply with Penal Code section 1016.5 by advising a defendant of only some of the potential immigration consequences of accepting a guilty or no contest plea was not substantial noncompliance: "if defendant's circumstances at the time of his 1992 plea did not, in fact, allow for the [omitted potential immigration consequence], the advisements he received . . . would have been in substantial compliance with the requirements of section 1016.5, in that they would have informed defendant of the only consequences pertinent to his situation"].)

Wendz points to subdivision (a)(5) of section 54444.2 as evidence of the existence of a reasonable alternative, but that section does not on its face provide a reasonable alternative to the regulations. It states, "The Superintendent and each operating agency shall establish and implement training programs for members of the statewide and operating agency parent advisory council *to enable them to carry out their responsibilities*." (§ 54444.2, subd. (a)(5), italics added.) The RPAC members' responsibilities are set forth in section 54444.4, and include the establishment of migrant education program goals, objectives, and priorities and advice on the selection,

development, and reassignment of migrant education program staff. (§ 54444.4, subd. (a)(1), (3).) At most, those responsibilities are only tangentially related to the issues the regulations seek to address—non-compliance with the statutory requirement of two-thirds parent membership, limited opportunities for parent participation on regional councils, and cooperative governance among councilmembers and with operating agencies. Wendz does not explain how the training required under subdivision (a)(5) of section 54444.2 would be "less burdensome and equally effective" as the regulations adopted by the Superintendent in addressing those issues. (Gov. Code, § 11346.2, subd. (b)(4)(A); *American Chemistry Council v. Department of Toxic Substances Control* (2022) 86 Cal.App.5th 146, 198 [finding that an alternative proposal was not reasonable because it "would not be equally effective in achieving the purpose of the statute"].) The Superintendent therefore was not required to describe this alternative in the initial statement of reasons.

### b. Final Statement of Reasons

The Superintendent's final statement of reasons also does not identify any specific alternatives he considered; it states only that all alternatives he considered were "in the form of public comments" and that "no alternative would be more effective and less burdensome to affected private persons than the proposed regulations or would be more cost effective to affected private persons and equally effective in implementing the statutory policy of other provisions of law."

Government Code section 11346.9 requires that the agency's final statement of reasons include "[a] determination with supporting information that no alternative considered by the agency would be more effective in carrying out the purpose for which the regulation is proposed, and would be

as effective and less burdensome to affected private persons than the adopted regulation, or would be more cost effective. . . to affected private persons and equally effective in implementing the statutory policy or other provision of law." (Gov. Code, § 11346.9, subd. (a)(4).) Although Government Code section 11346.9 does not specify that alternatives must be reasonable to be considered, the parties' arguments proceed on that assumption. We therefore accept the premise that only reasonable alternatives must be considered for purposes of this appeal.

Wendz argues that the Superintendent's final statement of reasons does not comply with Government Code section 11346.9 because he failed to specifically mention or justifiably reject an alternative of training programs proposed by a public comment. The public comment she is referring to states that the "concerns about bringing new voices to the RPACs" could "be adequately addressed with governance guidance and/or training as opposed to regulatory mandates."

As we have indicated, however, an agency need not respond to every alternative proposal presented by the comments if those proposals are not reasonable. Here, beyond the single, vague reference to "training," the comment cited by Wendz does not provide a specific way to deal with the problem of limited opportunities for new parent participation in the RPACs. (See *American Min. Congress v. E.P.A.* (9th Cir. 1992) 965 F.2d 759, 771 [holding that under the federal APA, "an agency need only respond to 'significant' comments, i.e., those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule"]; *International Ladies' Garment Workers' Union v. Donovan* (D.D.C. 1983) 722 F.2d 795, 815–816 [agency failed to consider "substantial testimony" and "[s]pecific proposals" for alternative actions].) In other words, the comment

does not, on its face, demonstrate that the alternative proposal of training will effectively address the issues raised by the Superintendent. (*American Chemistry Council v. Department of Toxic Substances Control, supra*, 86 Cal.App.5th at p. 198; *Wyoming v. USDA* (10th Cir. 2011) 661 F.3d 1209, 1244 [holding that alternatives that do not accomplish the objective of the proposed action are not reasonable].) Wendz has the burden of demonstrating error (*People v. Giordano* (2007) 42 Cal.4th 644, 666), but she does not explain how this alternative proposal is reasonable other than again citing section 54444.2, subdivision (a)(5). We therefore cannot fault the Superintendent for failing to expressly address it in his final statement of reasons.

Moreover, the Superintendent determined that specific rules were needed to ensure effective parental involvement in the RPACs throughout the state. As the Superintendent pointed out, local RPAC bylaws varied widely throughout the state, resulting in the dominance of nonparent members and many RPACs' noncompliance with the MEP's statutory requirements. Thus, the Superintendent determined—reasonably in our view—that establishing clear rules for governance of the RPACs would ensure that they are meeting statutory requirements and would "safeguard" the effectiveness of parental involvement on the councils. Because the Superintendent adequately explained its decision to adopt regulations, its failure to expressly address the proposed alternative to regulations—training programs—does not constitute substantial noncompliance with the APA.[13]

---

[13] We need not and do not address respondents' argument that the trial court properly found that training programs were not a reasonable alternative because the RPACs had no authority to implement election procedures.

Accordingly, Wendz has not shown that the Superintendent failed to substantially comply with the APA's requirement to consider reasonable alternatives.

### III.   CONCLUSION

We conclude that, except for the prohibition on alternates and the portions of the regulations the trial court previously invalidated, the regulations adopted by the Superintendent are valid.  The petition for a writ of mandate is granted to the extent it seeks to compel respondents to refrain from enforcing the prohibition on alternates in subdivision (a) of California Code of Regulations, title 5, section 12011 and the portions of the regulations the trial court invalidated—subdivision (c) of California Code of Regulations, title 5, section 12014 and the phrase "[t]o the extent possible" in subdivision (d) of California Code of Regulations, title 5, section 12019.  In all other respects, the petition for a writ of mandate is denied.  The parties should bear their own costs.

SWOPE, J.*

WE CONCUR:


HUMES, P. J.


BANKE, J.


A162648P

---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

San Francisco Superior Court

Judge Richard B. Ulmer

Munger, Tolles and Olson, Rohit K. Singla, Richard T. Johnson; California Rural Legal Assistance, Cynthia L. Rice; and Lawyers' Committee for Civil Rights- San Francisco, Deborah Escobedo for Plaintiff and Appellant.

California Department of Education, Amy Bisson Holloway, Virginia Jo Dunlap and Terri A. McFarland for Defendants and Respondents.